# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GRETCHEN MCDANIEL, and MATTHEW MCDANIEL, husband and wife, individually and as the parents and natural guardians of ALAINA MCDANIEL, a minor child, | ) ) ) ) ) ) | **CONSOLIDATED AT NO. 2:12-cv-1439** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Civil Action No. 2:12-cv-1439 |
| | ) | District Judge Nora Barry Fischer |
| KIDDE RESIDENTIAL and FIRE & COMMERCIAL, a division of UT FIRE & SECURITY; and SAM'S CLUB, a Division of Wal-Mart Stores, Inc., | ) ) ) ) ) | Magistrate Judge Lisa Pupo Lenihan |
| Defendants. | ) | |

_____

| | | |
|---|---|---|
| ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY a/s/o MATTHEW AND GRETCHEN MCDANIEL, | ) ) ) ) | Civil Action No. 2:12-cv-1473 |
| | ) | District Judge Nora Barry Fischer |
| Plaintiffs, | ) ) | Magistrate Judge Lisa Pupo Lenihan |
| vs. | ) ) | |
| KIDDE RESIDENTIAL & COMMERCIAL, and SAM'S CLUB, | ) ) | ECF No. 67 |
| Defendants. | ) ) | |

## REPORT AND RECOMMENDATION

## I. RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by Defendants Kidde Residential & Commercial, and Sam's Club at ECF No. 67 be denied.

## II. REPORT

### A. Facts

The following facts are undisputed unless otherwise indicated, and are taken from the parties' statements of material facts and responses thereto at ECF Nos. 69, 76, 77, 81, 82, 86, 87, and 88.[1]

In December 2008, Plaintiff Gretchen McDaniel ("Plaintiff" or "Mrs. McDaniel") purchased a set of two Kidde-brand multi-purpose dry chemical fire extinguishers (model FA110G) at Defendant Sam's Club located in Robinson Township, Pennsylvania ("Sam's Club"). (ECF Nos. 69 & 76 at ¶ 1.) The fire extinguishers were manufactured by Defendant Kidde Residential & Commercial ("Kidde") in 2008. (ECF Nos. 69 & 76 at ¶ 2.) Plaintiff purchased the fire extinguishers "because [her family] didn't have a fire extinguisher and [] needed one." (ECF Nos. 69 & 76 at ¶ 3.)

On the evening of October 17, 2010, Plaintiff was making donuts in the kitchen of her home with her oldest daughter Alaina ("Plaintiff daughter" or "Alaina"). (ECF Nos. 69 & 76 at ¶ 16.) Plaintiff filled a large stainless steel pot two-thirds of the way full with canola oil. (ECF Nos. 69 & 76 at ¶ 17.) Plaintiff left the pot of oil on the stove at a low setting while she went upstairs for less than 10 minutes to put her youngest daughter to bed. (ECF Nos. 69 & 76 at ¶ 20.) When Plaintiff returned to the kitchen and lifted the lid of the pot, the oil in the pot started to flame. (ECF Nos. 69 & 76 at ¶ 21.) Plaintiff then retrieved the fire extinguisher located to the

---

[1] Where appropriate, the Court also cites to underlying documentation and deposition transcripts.

right of the stove (hereinafter "Fire Extinguisher"). (ECF Nos. 69 & 76 at ¶ 22.) At the time of the fire, the Fire Extinguisher pressure gauge indicated that it was fully charged. (ECF Nos. 69 & 76 at ¶ 23.) At the time of the fire, the Fire Extinguisher had never been used. (ECF Nos. 69 & 76 at ¶ 24.) Plaintiff tried to make the Fire Extinguisher work by squeezing the handles together "at least three times, if not four times," but the Fire Extinguisher would not work. (ECF Nos. 69 & 76 at ¶ 25.) The Fire Extinguisher did not discharge. (ECF Nos. 69 & 76 at ¶ 26.) After handling the Fire Extinguisher, Plaintiff directed her daughter Alaina to go to the front of the house. Alaina followed her mother's directive. (ECF Nos. 69 & 76 at ¶ 27.) Plaintiff picked up the pot of burning oil and carried it from the kitchen stove towards the laundry room exit, approximately fifteen feet away, with the goal of carrying the pot of burning oil outside of her home. (ECF Nos. 69 & 76 at ¶ 31.) Plaintiff dropped the pot of burning oil in the laundry room and suffered severe burns. (ECF Nos. 69 & 76 at ¶ 34.) After dropping the pot of burning oil in the laundry room, Plaintiff exited her house, then re-entered it to retrieve her two daughters and take them outside of the house. (ECF Nos. 69 & 76 at ¶ 35.) Plaintiff then went back inside her house, and for the third or fourth time, squeezed the handles of the Fire Extinguisher together, but it would not discharge. (ECF Nos. 69 & 76 at ¶ 36.)

Plaintiff Allstate Property and Casualty Insurance Company, as subrogee of Matthew and Gretchen McDaniel ("Allstate"), hired Robert Rice ("Rice") to investigate the fire's origin and cause. (ECF Nos. 77 & 82 at ¶ 67.) When Rice inspected the McDaniel's home on October 19, 2010, he observed that the gauge of the subject Fire Extinguisher was in the green, indicating that it had not been used and was still charged and ready for use. (ECF Nos. 77 & 82 at ¶ 69.) Representatives from Defendants Kidde and Sam's Club attended a joint inspection of the McDaniels' home on November 3, 2010. (ECF Nos. 77 & 82 at ¶ 70.) At the conclusion of the

inspection, Rice took possession of the evidence, which included the subject Fire Extinguisher and an exemplar fire extinguisher. (ECF Nos. 77 & 82 at ¶ 71.) The exemplar fire extinguisher was the second fire extinguisher that was part of the twin-pack purchased by Mrs. McDaniel from Sam's Club in December 2008. (ECF Nos. 77 & 82 at ¶ 72.) Rice x-rayed the subject fire extinguisher which showed that the spring was visibly bent and therefore not seated properly. (ECF No. 77 at ¶¶ 73, 74.)

Defendants dispute that the spring was not seated properly and that any bend in the spring rendered the Fire Extinguisher defective. Specifically, Ronald Mauney ("Mauney"), Kidde's Senior Product Design Engineer testified as follows:

> [T]he spring is not confined within the fire extinguisher except at the bottom of the coupling to keep it centered. The spring is free to bend in one direction or another, simply out of necessity that we can't constrain the spring and maintain a good flow path through the fire extinguisher. We've also found that it doesn't really matter that the spring bows a little bit because it doesn't significantly affect the force the stem exerts on the stem—the valve stem of the extinguisher. Particularly since the spring only makes up a fraction of the normal force that would – that there would be on a charged extinguisher, that the internal pressure makes up – without knowing the numbers, probably two-thirds of the total force that's exerted on a stem in a charged extinguisher.

(ECF No. 82 at ¶ 74.) Plaintiffs note that the x-ray of the exemplar fire extinguisher revealed that the spring was straight up and down, but Defendants dispute that any bend in the spring rendered the Fire Extinguisher defective. (ECF Nos. 77 & 82 at ¶ 75.)

Rice transferred the subject Fire Extinguisher and the exemplar to Dr. David Bizzak ("Dr. Bizzak") for forensic evaluation. (ECF Nos. 77 & 82 at ¶ 76.) In addition to Dr. Bizzak, representatives from Kidde and Sam's Club attended the July 11, 2011, destructive exam of the subject Fire Extinguisher. (ECF Nos. 77 & 82 at ¶ 77.) Mauney attended the July 11, 2011 joint exam on Kidde's behalf. (ECF Nos. 77 & 82 at ¶ 78.)

Dr. Bizzak determined that the best and most repeatable means for testing the fire extinguishers was to apply force directly to the valve stem rather than squeezing the handles together. (ECF No. 77 at ¶ 80.) Defendants dispute, however, that the "best and most repeatable method" for testing the fire extinguisher was to apply force directly to the valve stem rather than attempting to squeeze the handles together. (ECF No. 82 at ¶ 80.) An assistant applied force directly to the valve stem, and used a gauge designed to measure the force that was being applied. On the first attempt to discharge the subject Fire Extinguisher, the gauge "bottomed out" at 35 pounds, and the subject Fire Extinguisher did not discharge. On the second attempt to discharge the subject Fire Extinguisher, the valve stem depressed, and the Fire Extinguisher discharged. The exemplar fire extinguisher discharged on the first attempt after 26 pounds of force was applied directly to the valve stem. (ECF No. 77 at ¶¶ 81-84.) Defendants do not dispute what happened during the testing, but contend that that the manner in which Dr. Bizzak tested the fire extinguishers was scientifically invalid, and therefore, the results of the testing are scientifically indefensible. (ECF No. 82 at ¶¶ 81-84.)

After both fire extinguishers were discharged, Dr. Bizzak took their respective measurements to compare them against Kidde's manufacturing specifications. (ECF Nos. 77 & 82 at ¶ 85.) According to Kidde's design drawings, the vertical positioning of the fire extinguisher's offsets is designed to be 0.210 +/- 0.010 inches. Dr. Bizzak determined that the subject Fire Extinguisher did not meet Kidde's manufacturing specifications in that the vertical positioning of the offsets within the subject Fire Extinguisher's valve-to-dip coupling varied from 0.175 to 0.181 of an inch. The vertical positioning of the exemplar's offsets was within tolerance. (ECF No. 77 at ¶¶ 86-87, 89.) Defendants do not dispute what Kidde's design drawings illustrate. Defendants do dispute, however, that any variance in the offsets rendered

the Fire Extinguisher defective.  Defendants submit the deposition testimony of Kidde's

Engineering Manager, Thomas Lucier ("Lucier") that the dimensions of the offsets are not

critical to the function of the Fire Extinguisher, and therefore, the subject Fire Extinguisher was

not defective.  (ECF No. 82 at ¶¶ 86-87, 89.)


### B.  Legal Standard

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving

party, "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the initial

burden of identifying evidence, or the lack thereof, which demonstrates the absence of a genuine

issue of material fact.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579,

1581-82 (3d Cir. 1992) (citing Celotex, 477 U.S. at 323-25).  Once that burden has been met, the

nonmoving party may not rest on the allegations in the complaint, but must "go beyond the

pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e) (1963)).  See also Orsatti v. New Jersey

State Police, 71 F.3d 480, 484 (3d Cir. 1995) ("plaintiff cannot resist a properly supported

motion for summary judgment merely by restating the allegations of his complaint, but must

point to concrete evidence in the record that supports each and every essential element of his

case.") (citing Celotex, 477 U.S. at 322).

An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. See Fed. R. Civ. P. 56(c)(2); Celotex, 477 U.S. at 324; J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

## C. Analysis

### 1. Strict Liability, Negligence, and Breach of Express and Implied Warranties

#### a. Defect

Defendants argue that summary judgment is warranted on Plaintiffs' claims of strict liability, negligence and breach of express and implied warranties because Plaintiffs' experts are unable to establish that the Fire Extinguisher was defective. Plaintiffs respond that they have come forward with credible evidence of a manufacturing defect in the Fire Extinguisher, and therefore, whether the Fire Extinguisher was defective must be decided by a jury.

In order to bring a claim for strict liability, negligence, and breach of warranties, Plaintiffs must prove, inter alia, that the Fire Extinguisher was defective. See Barnish v. KWI Bldg. Co., 980 A.2d 535, 541 (Pa. 2009) (applying Section 402A of the Restatement (Second) of Torts, and stating that in order to bring an action in strict liability, a Plaintiff must demonstrate "that the product was defective, that the defect caused the plaintiff's injury, and the defect existed at the time the product left the manufacturer's control."), cited in Ellis v. Beemiller, Inc., 910 F. Supp.2d 768, 773-74 (W.D. Pa. 2012). See also Pappas v. Sony Electronics, Inc., 136 F. Supp.2d 413, 428 (W.D. Pa. 2000) ("To sustain a product liability claim based on negligence, a plaintiff must prove that the product was defective, that the defect proximately caused an injury,

and that the defendant failed to exercise due care in designing or manufacturing the product."  To establish a claim for breach of implied warranties, "plaintiffs must show that the equipment they purchased from defendant was defective.").

Initially, the Court notes that the Pennsylvania Supreme Court[2] adopted § 402A of the Restatement (Second) of Torts in <u>Webb v. Zern</u>, 220 A.2d 853 (Pa. 1966), and reaffirmed the Second Restatement's vitality in <u>Tincher v. Omega Flex, Inc.</u>, No. 17 MAP 2013, 2014 WL 6474923, at *62 (Pa. Nov. 19, 2014).[3]  Section 402A states as follows:

> § 402A Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if
>
>> (a) The seller is engaged in the business of selling such a product, and
>>
>> (b) It is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule state in Subsection (1) applies although
>
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>>
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[4]

Restatement (Second) of Torts § 402A (1965).

---

[2] It appears undisputed by the parties that Pennsylvania law governs this diversity action.  <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v. Coviello</u>, 233 F.3d 710, 713 (3d Cir. 2000).

[3] The parties did not request to file supplemental briefs in light of <u>Tincher v. Omega Flex, Inc.</u>, No. 17 MAP 2013, 2014 WL 6474923 (Pa. Nov. 19, 2014), nor did the Court order the same because the parties rely on cases applying the Restatement (Second) of Torts.  Further, the <u>Tincher</u> Court set out to offer guidance and direction for the development of strict products liability theory, rather than a bright-line rule.  <u>See</u> <u>Tincher</u>, 2014 WL 6474923, at *72.

[4] The term "seller" includes the "manufacturer" of a product.  Restatement (Second) of Torts § 402A cmt. f.

Defendants argue that Plaintiffs cannot show that the Fire Extinguisher was defective because Plaintiff's own deposition testimony "repudiates the sole 'defect' identified by Plaintiff's engineering expert [Dr. Bizzak]." (ECF No. 68 at 11.) That is, Defendants contend that because Plaintiff testified that she squeezed the handles of the Fire Extinguisher together at least four (4) times on the night of the fire, she discredited her expert's statement that one cannot squeeze the handles together without depressing the valve stem, and that if the valve stem was depressed, the Fire Extinguisher would have discharged. (ECF No. 68 at 11-12.) Defendants conclude that Dr. Bizzak's entire defect theory is based on his "assumption" that Plaintiff was unable to squeeze together the handles of the Fire Extinguisher, and therefore, has no basis in fact, and must be rendered inadmissible. (ECF No. 68 at 13.) Without Dr. Bizzak's opinion, according to Defendants, Plaintiffs' only evidence of defect is Mrs. McDaniel's own statement that the Fire Extinguisher did not work when she attempted to use it. Without more, argue Defendants, they are entitled to judgment as a matter of law as to whether the Fire Extinguisher was defective. (ECF No. 68 at 14.)

Plaintiffs respond that Dr. Bizzak did not assume anything, but reviewed Mrs. McDaniel's deposition transcript, and that his conclusions are based on the outcome of his own investigation into the incident. Instead, Plaintiffs note that although Plaintiff testified that she squeezed the handles together, questions remain as to whether she was able to squeeze them completely together, and with the requisite amount of force necessary to depress the valve stem.

Here, Plaintiffs have come forward with evidence to raise a genuine issue of fact as to whether the Fire Extinguisher was defective. Plaintiffs have come forward with evidence that the Fire Extinguisher did not meet Kidde's manufacturing specifications; that the spring was bent within the valve-to-dip coupling and therefore not properly seated; that the spring's not being

properly seated created increased friction, sticking, or binding within the valve-to-dip coupling; and that this increased friction, sticking, or binding prevented Mrs. McDaniel from being able to apply enough grip force to discharge the Fire Extinguisher.

Defendants counter in their Reply Brief that Dr. Bizzak's method of testing the Fire Extinguisher was scientifically invalid, and that the spring orientation upon which Plaintiffs' defect theory is based was "normal" and did not affect the operation of the Fire Extinguisher. (ECF No. 80 at 1-4 & nn.3-4.)

This Court may not weigh the evidence. It is for the jury to evaluate Plaintiffs' and Defendants' respective theories as to defect. Further, unless reasonable minds could not differ as to whether the product is in a defective condition, the issue must go to the jury. Tincher v. Omega Flex, Inc., No. 17 MAP 2013, 2014 WL 6474923 (Pa. Nov. 19, 2014). Therefore, it is recommended that the Court deny Defendants' Motion for Summary Judgment on Plaintiffs' claims in strict liability, negligence, and express and implied warranties.[5]

   b. Malfunction Theory

Defendants next move for summary judgment on Plaintiffs' malfunction theory to prove that the Fire Extinguisher was defective. Defendants contend that because Plaintiffs are proceeding under a manufacturing defect theory, and because the Fire Extinguisher is available

---

[5] Defendants argue that Plaintiffs' claim for breach of express warranty fails because the remedy set out in the Fire Extinguisher's Owners Manual, (unreadable in Defendants' Exhibit 21, but quoted by Defendants in their brief at note 4), is expressly limited to repair or replacement. (ECF No. 68 at 16 n.4.) Defendants' argument is without merit because under Pennsylvania law, a limitation of remedies clause must be exclusively and expressly stated. 13 Pa. C.S. § 2-719(a)(2). Nothing in the limitation quoted by Defendants states that the remedy is the *exclusive* remedy for an alleged defect in material or workmanship. Therefore, these remedies are optional under the statute, and Plaintiffs' claim for breach of express warranty may proceed. See 13 Pa. C.S. § 2-719(a)(2); Jim Dan, Inc. v. O.M. Scott & Sons Co., 785 F. Supp. 1196, 1198 (W.D. Pa. 1992) (limitation must clearly communicate that it is the *only* remedy in a manner that a reasonable person could certainly understand). See also Mitsubishi Corp. v. Goldmark Plastic Compounds, Inc., 446 F. Supp.2d 378, 385 (W.D. Pa. 2006) (to be enforceable, the limitation clause must clearly state it is the exclusive remedy), rev'd on other grounds, 303 F. App'x 98 (3d Cir. 2008).

10

for inspection, Plaintiffs may not also raise a malfunction theory, relying on Ellis v. Beemiller, Inc., 910 F. Supp.2d 768, 774-75 (W.D. Pa. 2012). At the outset, this Court notes that it is not bound by the Ellis decision, and that the Ellis Court, in a subsequent decision, indicated that it could not locate authority confirming that the malfunction theory is inapplicable to cases where the allegedly defective product is available for examination. Ellis v. Beemiller, Inc., Civil Action No. 09-1414, 2013 WL 706227, at *8 n.24 (W.D. Pa. Feb. 26, 2013). See also Ellis, 910 F. Supp.2d at 779 n.10 ("The Court was unable to find case law which would support a finding that Plaintiffs are precluded from relying on the malfunction theory as a matter of law in light of their actual possession of the allegedly defective product.").[6] Hence, the Court only considers whether the Plaintiffs have come forward with evidence to raise a genuine issue of material fact as to the elements of the malfunction theory.

Unlike the specific defect theories (design defect or manufacturing defect), the malfunction theory allows a plaintiff to prove a product is defective by circumstantial evidence. Barnish, 980 A.2d at 541. "The malfunction theory affords a plaintiff an alternative route to establishing the existence of a defect, but does not ban the plaintiff from producing direct evidence that by itself would be insufficient under the specific defect theory." Baggio v. Maytag Corp., 660 F. Supp.2d 626, 633 (W.D. Pa. 2009). See also Varner v. MHS, LTD., 2 F. Supp.3d 584, 592 (M.D. Pa. 2014) (malfunction theory applied in manufacturing defect case); Hogan v. Raymond Corp., 777 F. Supp.2d 908 (W.D. Pa. 2011) (malfunction theory allowed to proceed even though allegedly defective product was available for inspection), aff'd in part, vacated in part on other grounds, 536 F. App'x 207 (3d Cir. 2013). A plaintiff must come forward with

---

[6] Other cases cited by Defendants in their Reply brief do not stand for the proposition that the malfunction and specific manufacturing defect theories are mutually exclusive. See ECF No. 80 at 4.

evidence of a malfunction, and with evidence eliminating abnormal use, or reasonable secondary causes for the malfunction.  <u>Barnish</u>, 980 A.2d at 541.

Here, Plaintiffs have come forward with evidence that the Fire Extinguisher did not discharge after Mrs. McDaniel pulled the pin and then squeezed the handles together three to four times.  She followed the exact instructions on the Fire Extinguisher's canister, even to the point of backing up six (6) feet after her first attempt failed.  The Fire Extinguisher's gauge indicated that it was charged and ready for use.  The fact that she pulled the pin first indicated that it had not been used previously, and that it was in the same condition as when she purchased it.[7]

Therefore, it is recommended that Defendants' Motion for Summary Judgment on the malfunction theory be denied.

2.  <u>Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL)</u>.

In support of their Motion for Summary Judgment on Plaintiffs' UTPCPL claim, Defendants argue that Plaintiffs "have not identified any misrepresentation made by Defendants regarding the benefits or uses of the Fire Extinguisher."  (ECF No. 68 at 17.)  Defendants further argue that Plaintiffs "cannot show that Mrs. McDaniel purchased the Fire Extinguisher in reliance on any misrepresentation."  (ECF No. 68 at 18.)  Plaintiffs respond that they have come forward with evidence to establish a genuine issue of material fact as to all elements of a cause of action pursuant to the UTPCPL.  (ECF No. 73 at 16.)

---

[7] Defendants point to the fact that the trigger handles were detached when the Fire Extinguisher was found after the fire, and therefore according to Defendants, Plaintiffs cannot eliminate abnormal use.  Mrs. McDaniel has testified repeatedly as to how she attempted to use the fire extinguisher by following the exact instructions on the canister. On this summary judgment record, unresolved issues as to how the trigger handles came to be detached, if found to be relevant by the trial judge, are better left for the jury.

The UTPCPL grants a private right of action to consumers harmed by unfair methods of competition or deceptive business practices. 73 Pa. C.S. § 201-9.2(a); <u>Baynes v. George Mason Funeral Home, Inc.</u>, No. 3:09-CV-153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011). Pursuant to the statute:

> Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, as a result of the use or employment by any person of a method, act or practice declared unlawful [by] this act, may bring a private action to recover actual damages.

73 Pa. C.S. § 201-9.2(a).

Thus, in order to maintain a cause of action under the UTPCPL, a consumer must show: (1) he purchased or leased the good primarily for consumer purposes; (2) he suffered some ascertainable loss; and (3) the loss resulted from an unlawful method, act, or practice under the statute. <u>Toy v. Metropolitan Life Ins. Co.</u>, 928 A.2d 186, 201 (Pa. 2007). In order to demonstrate an unlawful act under the UTPCPL, a consumer must offer evidence of one of the statutorily defined "unfair methods of competition," or evidence that fits the "catch-all" provision of the statute: "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. C.S. § 201-2(4)(i)-(xx) & (xxi); <u>Baynes</u>, 2011 WL 2181469, at *4. Further, a plaintiff need not be in direct privity with a defendant to bring an action regarding that defendant's wrongful conduct. <u>Johnson v. MetLife Bank, N.A.</u>, 883 F. Supp.2d 542, 547-48 (E.D. Pa. 2012).

As the underlying foundation of the UTPCPL is that of fraud prevention, the statute does not dispose of the traditional common-law fraud elements of reliance and causation. <u>Toy</u>, 928 A.2d at 202. In fact, Pennsylvania law requires a plaintiff alleging violations under any section of the UTPCPL, including the "catch-all" provision, to prove "that he justifiably relied on

defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance." Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004); Slapikas v. First Am. Title Ins. Co., 298 F.R.D. 285, 292 (W.D. Pa. 2014). Evidence of reliance must go beyond simply a causal connection between the misrepresentation and the harm. Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir. 2008). Instead, a plaintiff "must show that he justifiably bought the product in the first place (or engaged in some other detrimental activity) because of the misrepresentation." Hunt, 538 F.3d at 222 n.4 (citing Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001)).

Defendants' first argument that "the McDaniels have not identified any misrepresentation made by Defendants regarding the benefits or uses of the Fire Extinguisher," (ECF No. 68 at 17) is premised upon their reiteration that Plaintiffs' own expert "admit[ted] that the Fire Extinguish would have discharged if Mrs. McDaniel used it in the manner she claims to have on the night of the fire." (ECF No. 68 at 18.) Defendants contend that the product conformed to its representations—that is was "safe, reliable, easy to use, and effective for use in extinguishing household kitchen fires." (Id. at 17-18 (citing Plaintiffs' Complaint at ¶ 45.) To support this assertion, Defendants rely primarily upon Cooper v. Sirota, 37 F. App'x 46 (3d Cir. 2002); Silverstein v. Percudani, No. 3:04-CV-1262, 2005 WL 1252199 (M.D. Pa. May 26, 2005); and Schlegel v. State Farm Mut. Auto. Ins. Co., No. 3:11-CV-2190, 2013 WL 4041848 (M.D. Pa. Aug. 8, 2013). However, reliance on these cases is misplaced. Unlike in Cooper, Silverstein, or Schlegel, wherein the plaintiffs failed to allege any misrepresentation, Plaintiffs here *have* come forward with evidence to support a finding of misrepresentation under the definitions of the UTPCPL, that is, that the goods had characteristics and benefits that they did not have. See Cooper, 37 F. App'x at 48 (denying a claim where the plaintiff could not recall any alleged

misinformation provided by the defendant); <u>Silverstein</u>, 2005 WL 1252199, at *8 (granting the defendant's motion to dismiss where plaintiff alleged that defendant made no representation); <u>Schlegel</u>, 2013 WL 4041848, at *6 (granting summary judgment where no evidence indicated that defendant made a misrepresentation or engaged in wrongful conduct).

As a genuine issue of material fact exists regarding whether a defect existed at the time of sale, the Fire Extinguisher may not have conformed to the representations of safety and effective use made on its package.  <u>See</u> <u>supra</u> Part II.C.1.a.  It is undisputed that "the package made the explicit representations that the fire extinguishers inside were effective at fighting oil, gasoline and flammable liquid fires," that the extinguisher included an "[e]asy to read gauge that tells you that the extinguisher is charged and ready for use," that the extinguisher Mrs. McDaniel used was, in fact, "charged and ready for use" prior to use, and that the gauge was "still in green, indicating that it was . . . fully pressurized" prior to and after the incident.  (ECF Nos. 76 & 81 at ¶¶ 68-69, 73.)  The Fire Extinguisher may not have been "ready to use," however, because it was defective.  Hence, Plaintiffs have come forward with evidence to raise a genuine issue of material fact as to not only whether the Fire Extinguisher was defective, which rendered its use ineffective, but also as to whether Defendants violated the UTPCPL.  <u>See</u> <u>DeFebo v. Andersen Windows, Inc.</u>, 654 F. Supp.2d 285, 292 (E.D. Pa. 2009) (permitting the plaintiff to raise a UPTCPL claim under either fraudulent or negligent misrepresentation).

Defendants next contend that this Court must grant summary judgment, as Plaintiffs "cannot show that Mrs. McDaniel purchased the Fire Extinguisher in reliance on any misrepresentation."  (ECF No. 68 at 18.)  Pennsylvania law requires a plaintiff alleging violations under *any* section of the UTPCPL, including the "catch-all" provision, to prove that he justifiably relied on defendant's wrongful conduct or misleading representation.  <u>Y</u>occa, 854

A.2d at 438 ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on defendant's wrongful conduct . . . ."); Toy, 928 A.2d at 202 ("[P]laintiff alleging violations of the Consumer Protection Law must prove justifiable reliance.").

Here, Defendants contend that Plaintiffs offered no evidence that Mrs. McDaniel "knew anything about the Fire Extinguisher, its uses, features or benefits, prior to or at the time of her purchase." (ECF No. 68 at 18.) Conversely, Plaintiffs rely upon an analogous situation in Mazur v. Milo's Kitchen, LLC., No. 12-1011, 2013 WL 3245203, at *7 (W.D. Pa. June 25, 2013). There, a consumer sued a dog treat manufacturer for alleged defective dog treats. Mazur, 2013 WL 3245203, at *1-2. Since "no reasonable person would feed dog treats to their dogs knowing that there was a substantial risk of death or illness from doing so," the Mazur court denied defendants' Motion to Dismiss under the UTPCPL. Mazur, 2013 WL 3245203, at *8. While Defendants here contend that there is no indication that Mrs. McDaniel "knew anything about the Fire Extinguisher, its uses, features or benefits, prior to or at the time of purchase," Mrs. McDaniel *did* know that she was buying a fire extinguisher. (ECF No. 68 at 18.) As no reasonable buyer would purchase a product without relying on a guarantee that it would fulfill its quintessential function—here, that a new fire extinguisher would discharge to extinguish a fire when used in the correct manner—Mrs. McDaniel relied upon the operation of this very basic function in making her purchase. (ECF Nos. 69 & 76 at ¶ 3) (Mrs. McDaniel purchased the product because her household "didn't have a fire extinguisher and [] needed one.) Consequently, Plaintiffs have come forward with evidence to raise a genuine issue of material fact as to whether she justifiably relied on Defendants' representations and summary judgment must be denied. See Toy, 928 A.2d at 208 ("We have stated that justifiable reliance is typically a question of fact for the factfinder to decide, and requires a consideration of the parties, their

relationship, and the circumstances surrounding their transaction."). For the reasons set forth above, it is recommended that Defendants' Motion for Summary Judgment on the UTPCPL claim be denied.

3. Loss of Consortium

Defendants argue that because Mr. McDaniel's loss of consortium claim is derived from Mrs. McDaniel's recovery in tort, summary judgment should be granted as to the loss of consortium claim. (ECF No. 68 at 19.) As discussed supra Part II.C.1.a., Defendants' Motion for Summary Judgment must be denied because Plaintiffs have raised a genuine issue of material fact as to whether the Fire Extinguisher was defective. Therefore, it is recommended that Defendants' Motion for Summary Judgment relating to Mr. McDaniel's loss of consortium claim also be denied. See generally Scattaregia v. Shin Shen Wu, 495 A.2d 552, 554 (Pa. Super. Ct. 1985) (loss of consortium action is a derivative claim, and its success is dependent upon injured spouse's right to recover).

4. Negligent Infliction of Emotional Distress (NIED)

Defendants argue that they are entitled to summary judgment on the NIED claim asserted on behalf of Plaintiffs' minor daughter, Alaina, because: 1) Alaina did not contemporaneously observe her mother's injuries; 2) there is no evidence that Alaina suffers or suffered from any physical manifestations of emotional distress arising out of the fire. (ECF No. 68 at 20-23.) Plaintiffs respond that they have come forward with evidence to raise a genuine issue of material fact as to all elements of a NIED claim. (ECF No. 73 at 18-23.)

Negligent infliction of emotional distress (NIED) is an actionable tort under Pennsylvania law. Sinn v. Burd, 404 A.2d 672, 686 (Pa. 1979); Armstrong v. Paoli Mem'l Hosp., 633 A.2d 605, 609 (Pa. Super. Ct. 1993). In order raise a claim for NIED, a plaintiff must demonstrate one of four factual scenarios: (1) where the defendant owed a fiduciary duty toward the plaintiff; (2) where the plaintiff suffered a physical injury that caused the emotional distress; (3) where the plaintiff was in the "zone of danger" of the defendant's tortious conduct; or (4) where the plaintiff witnessed a serious injury to a close family member. Doe v. Phila. Cmty. Health Alt. AIDS Task Force, 745 A.2d 25, 27 (Pa Super. Ct. 2000), aff'd, 767 A.2d 548 ( Pa. 2001).

In terms of bystander recovery under the fourth scenario, a plaintiff must be a "reasonably foreseeable" plaintiff due to the traumatic injury caused by the defendant. Sinn, 404 A.2d at 686. A plaintiff must: (1) be located near the scene of the accident; (2) suffer a contemporaneous and sensory observance of the accident; and (3) be closely related to the victim. Id. As such, the observance by the plaintiff does not have to be purely visual: one can witness the traumatic event by other sensory perceptions. Neff v. Lasso, 555 A.2d 1304, 1314 (Pa. Super. Ct. 1989); Krysmalski v.Tarasovich, 622 A.2d 298, 304 (Pa. Super. Ct. 1993) (quoting Neff, 555 A.2d at 1314). In order to be contemporaneous, the observance must be an immediate and direct trigger for the emotional distress. Neff, 555 A.2d at 1313; Krysmalski, 622 A.2d at 304; Bloom v. Dubois Reg'l Med. Ctr., 597 A.2d 671, 682 (Pa. Super. Ct. 1991) (stating that "no buffer of time or space [may exist] to soften the blow.").

In general, a plaintiff must prove physical injury to sustain a claim for NIED. Doe, 745 A.2d at 28. Physical manifestations cannot be temporary, transitory, or fleeting, but rather severe or recurring. Armstrong, 633 A.2d at 609; Krysmalski, 622 A.2d at 305; Love v. Cramer,

606 A.2d 1175, 1179 (Pa. Super. Ct. 1992). Moreover, medical evidence is not required in an action claiming NIED. Krysmalski, 622 A.2d at 305.

Defendants argue that Alaina did "not witness her mother getting burned when Mrs. McDaniel dropped the flaming pot." (ECF No. 68 at 21.) In support of this position, Defendants rely primarily upon Mazzagatti v. Everingham, 516 A.2d 672 (Pa. 1986); Bloom, 597 A.2d 671; Armstrong, 633 A.2d 605; and Yandrich v. Radic, 433 A.2d 459 (Pa. 1981). This reliance is misplaced. In Mazzagatti, the Pennsylvania Supreme Court denied recovery to a mother who arrived to see her injured daughter *after* the traumatic accident had occurred. 516 A.2d at 679. Similarly in Bloom, the court dismissed husband's claim where there was no infliction of injury by defendants when wife attempted to commit suicide, and in Yandrich, where plaintiff's decedent did not witness son's fatal accident. Bloom, 597 A.2d at 682-83; Yandrich, 433 A.2d at 461. Finally, in Armstrong, the court denied recovery to a wife who was erroneously told by the hospital that her husband was the victim of a severe car accident, which the wife did not contemporaneously perceive. 633 A.2d at 615.

Here, there is a genuine issue of material fact as to whether Alaina observed the traumatic events occurring contemporaneously with the alleged failure of the Fire Extinguisher. Alaina may have observed the traumatic event through a sense other than visual perception, like the auditory observances in Krysmalski or Neff. In Neff, the court permitted a plaintiff-wife to recover under NIED where she did not visually observe the actual accident, but saw a speeding vehicle heading for her husband's pickup truck, heard the collision, and immediately ran out of her home to view her husband unconscious on the lawn. 555 A.2d at 1313. Likewise, the court in Krysmalski held that a plaintiff-mother properly established a claim for NIED, since, even though the mother did not visually witness a negligent driver hit her children, she heard the

collision and knew that her kin were outside in the parking lot. 622 A.2d at 301-03. While it is true that Alaina did not *see* her mother getting burned, the parties disagree as to whether or not Alaina was "within earshot of the laundry room" when Mrs. McDaniel tried to remove the burning pot. (ECF Nos. 76 & 81 at ¶ 83.) Accordingly, since Alaina "never left the house" during the incident that was caused by the alleged failure of the Fire Extinguisher, summary judgment for Plaintiffs' NIED claim cannot be granted. (ECF Nos. 76 & 81 at ¶ 84.)

Defendants also argue that the Plaintiffs' NIED claim is flawed, as Plaintiffs allege that "Alaina witnessed her mother's injuries only *after* they had already been sustained." (ECF No. 80 at 6.) Again, while it is true that Alaina did not see Mrs. McDaniel's severe burns to the face until after the fire hit her flesh, the parties disagree as to whether Alaina was "within earshot of the laundry room" when Mrs. McDaniel tried to remove the burning pot when she sustained burns, thereby contemporaneously taking in the traumatic event through auditory or olfactory cues. (ECF Nos 76 & 81 at ¶ 83.) Like the cases Defendants rely upon above, Defendants' reliance on Friend v. Saldana, 23 Pa. D. & C. 4th 316, 330-31 (Pa. Com. Pl. 1995); Mazzagatti, 516 A.2d at 679; Brooks v. Decker, 516 A.2d 1380 (Pa. 1986); Burkit v. Schubert, 35 Pa. D & C.3d 277 (Pa. Com. Pl. 1984); Yandrich, 433 A.2d at 461; and Hoffner v. Hodge, 407 A.2d 940 (Pa. Commw. Ct. 1979) is similarly misplaced. The plaintiffs in these cases could not have contemporaneously observed the traumatic event, as they arrived only *after* the incident took place. Conversely, genuine issues of material fact exist as to whether Alaina was present at the time of Mrs. McDaniel's injury.[8] (ECF Nos. 76 & 81 at ¶ 84.) Therefore, it is recommended that Defendants' Motion for Summary Judgment be denied in this respect.

---

[8] It is important to note that a claim for NIED focuses on the contemporaneous sensory observance of an isolatate traumatic event, not the facts and circumstances preceding and following the event. See Neff, 555 A.2d at 1309; see also Krusmalski, 622 A.2d at 303.

Finally, the Defendants claim that there is "no evidence that Alaina McDaniel suffers or suffered from any physical manifestations of emotional distress arising out of the fire." (ECF No. 68 at 20-21.)  In doing so, Defendants primarily rely upon Armstrong, 633 A.2d at 609; Toney v. Chester Cty. Hosp., 961 A.2d 192 (Pa. Super. Ct. 2008); and Love, 606 A.2d at 1175.  Plaintiffs *have* adduced physical manifestations of the emotional distress, the extent of which must be assessed by the trier of fact.  Plaintiffs contend that Alaina "has suffered from nightmares and continues to suffer from nightmares," that she is "anxious and very tense," that she is "afraid of seeing flames . . . and is nervous when her mother is cooking dinner," and that she is "more cautious, nervous, and reactionary." (ECF Nos. 76 & 81 at ¶¶ 86-89).  Certainly, these are not conditions of "temporary fright, nervous shock, nausea, grief, rage and humiliation" that the court would deny in Armstrong, 633 A.2d at 609.  Instead, like in Love, where "symptoms of severe depression, nightmares, stress and anxiety" sufficiently stated physical manifestations of emotional suffering to sustain a cause of action for NIED when a daughter witnessed her mother's heart attack proximately caused by her physician, Plaintiffs have done just the same. 606 A.2d at 1179.  And, despite the Defendants' contention that "Alaina has never received any medical treatment," (ECF No. 68 at p. 23), Pennsylvania law has rejected the necessity of medical evidence as a requirement for a NIED claim.  See Krysmalski, 527 A.2d 988 (stating that "medical evidence is not required in an action for damages" under NIED).  For these reasons, it is recommended that Defendants' Motion for Summary Judgment regarding NIED be denied.

5.  <u>Wage Loss and Disability</u>

In support of their Motion for Summary Judgment on Mrs. McDaniel's approximately $2 million wage loss/disability claim, Defendants argue that "the record shows no basis either for such a claim or in such an amount." (ECF No. 68 at 23.) Defendants rely on the following language from the Pennsylvania Superior Court in arguing that the wage loss/disability claim should not be submitted to the jury:

> [Pennsylvania law requires] not merely conjecture, but rather sufficient data from which the damages can be assessed with reasonable certainty. Loss of earning power and its amount must appear by proper and satisfactory proof and not be left to conjecture. [I]n order for a jury to be permitted to consider a future loss of earning power, it is necessary that there be competent evidence of the likelihood that disability will continue in the future. Evidence that permanent injury has been sustained is not equivalent to evidence that future earning capacity has been impaired. <u>There must be some evidence from which a jury can reasonably infer that earning power will probably be reduced or limited in the future.</u>

(Defendants' Brief in Support of Summary Judgment, ECF No. 68 at 23 (quoting <u>Kearns v. Clark</u>, 493 A.2d 1358, 1364 (Pa. Super. Ct. 1985) (citations omitted) (substantive language omitted by Defendants not properly designated by ellipsis)) (emphasis added by Court).

In <u>Kearns</u>, a plaintiff lost a kidney subsequent to a hysterectomy.[9] The Superior Court reversed and remanded for a new trial only as to damages because there was absolutely no evidence presented as to future medical expenses or wage loss; Plaintiffs had conceded in answers to pretrial interrogatories that they did not anticipate a loss of future earning capacity or future medical expenses. 493 A.2d at 1365. Nevertheless, the trial court in <u>Kearns</u> overruled defendants' objections and instructed the jury on loss of future earning capacity and future medical expenses. <u>Id.</u>

---

[9] The Superior Court noted that her remaining kidney was healthy. 493 A.2d at 1363 n.3.

Here, Plaintiffs have come forward with evidence of Mrs. McDaniels' disability and future wage loss such that it must be considered by the jury. This summary judgment record is replete with evidence that Mrs. McDaniel's earning capacity has been compromised. Dr. O'Toole, who provided clinical, surgical and therapy-related care for Mrs. McDaniel, states that she suffered extensive second and third degree burns to both legs, and second and third degree burns to the face and neck. He notes that all burns have left functionally and cosmetically disfiguring scars. He further indicates that she suffers permanent nerve pain for which there is no effective treatment. He notes that burns of this magnitude always require additional surgery to restore function. He further notes that restoration to normal functional status is impossible. Mrs. McDaniel's secondary care will include a series of operations to release restricted joints on at least the left foot. Dr. O'Toole states that Mrs. McDaniel's "position as a dental hygienist could prove to be very problematic as any job that requires prolonged standing would lead to leg swelling and additional discomfort." He states that she "will have a degree of permanent functional disability," and "permanent pain." (Exhibit O'Toole 1, ECF No. 75-29 at 21-22.)

Further, Plaintiffs submit the expert report of Dr. Burke, an economist, who opines as to Mrs. McDaniel's earning capacity in Exhibit 18 at ECF No. 70, a 63-page exhibit. Defendants argue that this report is insufficient because it assumes that Mrs. McDaniel will return to work which would require her to be recertified as a dental hygienist. (ECF No. 68 at 24.) Further, Defendants contend that Dr. Burke did not consider the expense of child care if Mrs. McDaniel does return to work. It is the jury's duty to weigh the evidence and to determine how much weight it will afford Dr. Burke's report. But unlike the case in Kearns, Plaintiffs have come forward with enough evidence to get Mrs. McDaniel's wage loss claim to the jury. It is recommended that Defendants' Motion for Summary Judgment on this issue be denied.

6.  <u>Punitive Damages</u>

Finally, Defendants argue that their Motion for Summary Judgment on the issue of punitive damages must be granted because Plaintiffs "have failed to satisfy the high standard for imposition of this 'extreme remedy.'" (ECF No. 68 at 25.)  The parties appear to agree on the standard for recovering punitive damages.  <u>See</u> Plaintiffs' Brief in Response, ECF No. 73 at 26 ("Defendants have correctly identified the standard for awarding punitive damages.").  Plaintiffs emphasize, however, that they have come forward with evidence that "Kidde knew of other complaints regarding fire extinguishers that failed to discharge, but made no attempts to investigate the complaints to determine the cause of the failures, or to prevent any such incidents from occurring in the future."  (ECF No. 73 at 27.)  Plaintiffs continue that, instead, those complaints were buried in Kidde's legal department instead of notifying its Corporate Quality Control Manager, Stuart Jones, whose job was to conduct a forensic tear down to determine the cause of the symptoms that the customer reports.  <u>Id.</u>  Plaintiffs point to the deposition of Jones who testified that he was surprised to learn of a number of incidents in which a customer reported that a fire extinguisher had failed to discharge.

In their Reply Brief, Defendants argue that documentation demonstrates that the quality control process at Kidde between 2005 and 2010 was robust.[10]

When dealing with a product used in emergency situations such as a fire extinguisher, the role of corporate quality control would seem to be of the utmost importance.  Here, Plaintiffs have come forward with evidence during the relevant time period and immediately thereafter, that quality control was not functioning as it was intended, and that as a consequence,

_____

[10] In Defendants' original Reply Brief at ECF No. 80, Defendants failed to file the 259 documents cited in support of this proposition.  When asked by the Court to supply these documents, Defendants motioned to file an amended reply brief wherein they submitted 6 "representative" documents.

investigations into why fire extinguishers were not properly discharging were not undertaken. As Manager of Quality Control, Stuart Jones testified that he is responsible for overseeing customer complaints and examining products returned to Kidde for forensic teardowns. The record reflects customer complaints dealing with the performance of Kidde's fire extinguishers, and yet, Jones had no knowledge of any of these complaints. In fact, documentation reflects that the only action taken in response to many of the complaints was to send a new unit. The "representative" documents submitted by Defendants consist of the forensic examination of the Fire Extinguisher in issue in this case dated 2011.[11] They do not demonstrate that the quality control process at Kidde during the relevant time period was robust or otherwise. Consequently, a reasonable trier of fact could conclude that Kidde was recklessly indifferent to the rights of other purchasers of its fire extinguishers.

Plaintiffs have come forward with evidence to raise a genuine issue of material fact as to whether Plaintiffs are entitled to punitive damages. Therefore, it is recommended that Defendants' Motion for Summary Judgment on this issue be denied.

### III. CONCLUSION

For the reasons set forth above, it is respectfully recommended that the Motion for Summary Judgment filed by Defendants Kidde Residential & Commercial, and Sam's Club at ECF No. 67 be denied.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation. Any party opposing the objections shall

---

[11] The Court set the relevant time period for the production of quality control documents for the years 2005-2010. Yet, the "representative" quality control document produced by Defendants is dated 2011.

have fourteen (14) days from the date of service of objections to respond thereto. Failure to file

timely objections will constitute a waiver of any appellate rights.


Dated: February 9, 2015                  BY THE COURT:


                                                        _____
                                                        LISA PUPO LENIHAN
                                                        United States Magistrate Judge


cc:     All Counsel of Record
          Via Electronic Mail